**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THE UNITED STATES OF AMERICA,

          Plaintiff,

v.                                                                    Case No. 11-CR-20703
                                                                      Honorable Denise Page Hood

SHERROD DAVIS,

          Defendant.

_____/

**ORDER GRANTING MOTION TO SUPPRESS EVIDENCE**

**I.**      **BACKGROUND**

On November 9, 2011, the grand jury indicted Defendant Sherrod Calvin Davis

("Davis") with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §

922(g)(1), along with a forfeiture allegation of the firearm at issue, a HW 38, Model L 38

Special, Hweinrauch, .38 caliber revolver, bearing serial number #502495.

Davis asserts that on October 16, 2011, he was unlawfully stopped and searched by Detroit

Police Officers. Davis was standing near a Marathon gas station on the corner of Diversey and

Livernois in Detroit, Michigan. According to police reports, three officers observed Davis standing

near the gas station. As the police car pulled into the gas station, Davis began walking toward the

entrance of the gas station. Officer George Alam claims he observed a "large bulge the shape of a

handgun" in Davis' right jacket pocket and the pocket appeared weighed down. The officers

approached Davis and ordered him to remove his hand from his pocket. Davis claims he complied

with the officers' orders. Davis then began placing his hand back in his pocket, at which time the police arrested and handcuffed Davis. The officers recovered a firearm in Davis' pocket as a result of the arrest and search of Davis.

## II.     ANALYSIS

### A.     Hearing Testimony

A hearing was held in this matter and testimony was taken and considered by the Court. Police Officer George Alam, an officer since 2003 with the Detroit Police Department, testified that as a result of his training and experience in the police department, he could recognize the "signs" of persons carrying guns or trying to "hide something." He stated that on October 16, 2011, he was driving a semi-marked police car, a black Ford Crown Victoria. Officers John Gardner and Timothy Simons were with him; Gardner in the passenger seat and Simons in the back behind Alam. They were in a "high crime" area of Detroit.[1]  The officers were on their way to a scene at Majestic and Weathersby, which they had previously responded to and were returning to that scene to pick up spent gun shells.

Traveling on Livernois, Alam claims he made eye contact with Davis from a distance of approximately three car lengths or less and observed Davis' facial expression. Davis was standing still near the edge of the gas station, close to the sidewalk and street. Alam was driving about 20 mph. It was around midnight, but the area was well lit. Alam claims that Davis looked nervous and about five seconds after eye contact, Davis started walking toward the door of the gas station, away from the street. Alam pulled into the gas station parallel to the building and close to Davis. Alam

---

[1]The officer testified that most areas of Detroit are considered "high crime."  He could not identify an area of Detroit that was not "high crime."

claims that he saw that Davis' pocket was "weighed down" and that Davis put his hand in and out of his right pocket. Alam directed Davis to take his hand out of the pocket. Accordingly to Alam, Davis took his hand out and put it back in and took it out again. When Davis took his hand out of his pocket, Alam testified that he saw a bulge in the "shape of a gun" in the pocket of Davis' long sleeved outer coat. Alam said, "he's got it, he's got it" and his partners then exited the vehicle and detained Davis and in the process recovered a gun from Davis' outer coat pocket. However, Alam's statement was not in the police report.

Alam further testified that he and his partners were stopping at the gas station for water or tobacco. No one had placed a call to have Davis investigated and no one had reported any disturbance at the gas station. The officers did not observe any crime being committed. This was the third comparable investigation that the officers had made that evening. The officers claim that the gun was in Davis' outer coat pocket.[2] Alam remembered nothing else about Davis' attire.

Officer Timothy Simons gave similar testimony. Simons testified he worked for the Detroit Police Department, Special Operations, mainly in the "Delta Zone," an area with a higher level of violent crimes, murders, and robberies. He testified that the officers were "proactive," looking to "find a reason to have contact with somebody," to ticket or advise them. Simons testified that he was not in a "Delta Zone" on October 16, 2011. He claims he did not see Davis until the officers were pulling into the station. He testified that when he first saw Davis, Davis was "propped up" with his back against the wall of the gas station. The area was well lit, like daylight. He stated that Davis was just standing there, not looking at the officers with his foot up against the wall. He saw Davis' expression but could not recall it. The first movement Davis made was what Simons called a

---

[2] Davis claims the gun was tucked into this pants covered by a hooded sweatshirt he was wearing under his coat.

"check," putting his hand in his right pocket.  Simons testified that he had received training from

a federal agency, which highlighted certain actions of perpetrators, including a "perp check."  A

"check" was described as an involuntary action that "bad guys do."  Simons also claimed that when

Davis turned to walk toward the door, Davis was separating himself from the incident and this was

suspicious behavior.  It must be noted that Davis did not move "away" from the officer but walked

in the same direction as the officers were proceeding.

Simons stated that the right side of Davis' jacket was hanging lower than the other (even

though the other side of Davis' jacket was facing the gas station wall) and that Davis checked the

pocket once and then again.  Based on his training, Simons testified that the swinging pocket was

called the "pendulum effect."  Simons said the officers' vehicle was at a crawl alongside Davis when

Alam said, "he's got it," which Simons took to mean he had a gun.  At that point Simons stated he

exited the vehicle and asked Davis "what's in your pocket?"  Simons said Davis said, "shit," and

Simons said that Davis said it "like I'm caught."  Simons claims Davis then attempted to put his

hand back in his pocket but could not because Simons had put him in a "full Nelson."  Simons

testified that Alam pulled the weapon out of Davis' pocket even though he did not see that happen.

Gardner assisted Simons with the detention.  Simons recovered nothing else from Davis.  Simons

also indicated the officers had made some similar stops earlier in the evening, including "three

bums."  Simons noted the video camera on the patrol car was not working.

Officer John Gardner's testimony was similar.  He saw Davis west of the store doorway,

looking down.  Then he stated Davis walked normally toward the door.  Gardner also claims he saw

the jacket weighted down with a large bulge in it.  He testified that Davis put his hand in and out of

his pocket.  Gardner said he never touched Davis and that he did not search him.  Gardner believed

4

the jacket produced by defense counsel was the jacket or "something similar," but he did not recall whether Davis was wearing a hooded sweatshirt. He only remembered a dark shirt. Gardner testified that none of the officers mentioned Davis before turning into the gas station near the building.

Davis also testified. In some ways his testimony did not differ from that of the officers. Davis testified that he walked to the store from his home to shop. He casually knew the people in the station. Davis testified the he made purchases using his Bridge Card; a copy of his Bridge Card transactions showed that purchases were made about nine minutes after midnight on October 16, 2011. After leaving, Davis stated that he walked back toward the store because he realized he had left his Bridge Card. While doing so, Davis claims the police "whipped up on" him. They asked what was in his pocket and he said "shit," meaning nothing was in his pocket. When the police directed him to take his hand out of his pocket, he did, but placed it back in again. The police then jumped out and grabbed him. The driver went in his pocket, then through his coat and then opened his sweater and grabbed the gun from inside his brown "hoodie" where he had stuffed the gun. He testified the officer had grabbed a pop bottle and a bag, which were thrown on the ground. Davis testified that he had the pop bottle in his right coat pocket and cigarettes in his left pocket and that the gun was tucked into his pants inside his inside jacket pocket, over which he had his outer jacket. Davis said he had the gun for protection as he had been robbed the previous week. Davis testified that one of the officers recognized him as the man who was robbed the previous week.

### B.    Reasonable and Particularized Suspicion

The Supreme Court has recognized several exceptions to the Fourth Amendment's warrant and probable cause requirements for searches and seizures, to protect police officers and the public

from violence in circumstances where probable cause may be lacking. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). "[P]rotection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). The Supreme Court has identified three types of reasonable, and permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause." *United States v. Pearce*, 531 F.3d 374, 380 (2008).

Officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). In evaluating a *Terry* stop, the court engages in a two-part analysis of the reasonableness of the stop: whether there was a proper basis for the stop, and, if the stop was proper, whether the degree of intrusion was reasonably related in scope to the situation at hand. *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). "Reasonable suspicion" is a less demanding standard than probable cause. *United States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011). It requires a showing considerably less than a preponderance of the evidence, but the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *Id.* (citations omitted). The officer's determination is made in light of the totality of the circumstances. *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

6

The Sixth Circuit has denied a motion to suppress based on the totality of the following circumstances: the area was a high crime area; the defendant upon seeing the officers became nervous; the defendant's hands were in his pockets as the defendant slowly backed away from the officers; that the officer fearing a weapon in the defendant's pants drew his own weapon and ordered defendant to show his hands subsequently searching the defendant. *Pearce*, 531 F.3d at 377–78.

The Government argues that reasonable suspicion was raised by the officers' observations: that Davis looked nervously at the officers; that Davis walked away after having eye contact with one of the officers; that Davis had a bulge in his jacket pocket shaped like a gun; that Davis said "shit" as if he were caught; that Davis did a "check" on the bulge in his pocket, putting his hands in and out of his pocket; that Davis was in a "high crime" area of Detroit, late at night; that Davis never stopped walking away from the officers until stopped.

Davis argues that the Government would have a sound argument if all the factors it claims were present when Davis was stopped. Davis claims that if you take the "nervous look" out of the equation, the Government has nothing but a man walking toward a gas station building at a normal pace. Davis argues that there is nothing meaningful about this location, which is like every other gas station in a "high crime" area. He further argues that the officers never testified about the time of the day or the location except to note that it was one of numerous alleged "high crime" areas in Detroit. Davis asserts that the bulge the officers claim to have seen in Davis' pocket could have easily been a cell phone, wallet, iPod, or pop, as Davis claimed. Davis asserts that in each case where the courts have found that a bulge supported a *Terry* stop, other factors have been considered in connection with that factor, the presence of illegal activity or other nervous activity, leading to reasonable suspicion. *See United States v. Holyfield*, 282 Fed. App'x. 129, 131 (3d Cir. June 18,

7

2008); *United States v. Hunter*, 291 F.3d 1302, 1306–07 (11th Cir. 2002). This nervous activity has included moving a hand in and out of the pocket with the bulge or repeatedly touching the area with the bulge. *See United States v. Moore*, 2001 WL 302057, *1 (6th Cir. 2001); *United States v. Stone*, 7 F.Supp.2d 441, 446 (S.D.N.Y. 1999).

However, in the Sixth Circuit case *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), the court held that the officer lacked reasonable suspicion to conduct a *Terry* stop under circumstances somewhat similar to this case. The defendant in *Beauchamp* was spotted by police as he was standing and talking to another man in a housing project. It was in the early morning hours, approximately 2:30 a.m., in mid-February. When the officer approached the defendant, the defendant hurriedly walked away. The officer yelled to his partner to stop the "suspicious suspect." The officer's partner parked near the defendant. The defendant walked behind a fence and then was ordered to stop. The defendant came back from around the fence. The officers stated that the defendant seemed nervous and gave vague answers to their questions about where he was going. The defendant was frisked but nothing was found on him. Following the defendant's consent to a search of his person, several baggies of crack were found on him.

The Sixth Circuit, based on the totality of the circumstances, found there was not sufficient reasonable suspicion to stop the defendant. The court found that there was "[n]othing about the conduct . . . to transform a permissible walk away from a police officer into a suspicious act." 659 F.3d at 571. The court noted there was no eye contact. But also noted that if there had been—would that have been described as "furtive" or "evasive." *Id.* The court wrote: "The ambiguity of Beauchamp's conduct may be susceptible to many different interpretations, but that does not render

8

it suspicious. An inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity." *Id.*

As in *Beauchamp*, Davis' actions are not objective and particularized indicia of criminal activity. Davis was standing against the wall of a gas station. While Davis may have looked at the officers, it must be noted that they were in an unmarked vehicle with only police grill lights to distinguish it as police. It is not clear he immediately recognized them as police. He walked not away but *toward* the gas station entrance, the same direction the officers were taking. According to the officers, he was in a "high crime" area of Detroit. Yet the officers were hard pressed to note any area not "high crime" in Detroit; the Court is not inclined to give this factor much weight.

One officer saw a large bulge in Davis' pocket, yet all had plain view of him. The other officers claim the pocket was weighed down. The officers claimed that Davis was moving his hand in and out of his pocket. Davis claimed the gun was inside his coat under a sweatshirt. The officers did not dispute the type and style of coat offered by Davis as the one he was wearing that night. Nor do the officers dispute that Davis had been in the store that night and made purchases, which could have easily accounted for the bulge in Davis' pocket. The officers' testimony as to the meaning of Davis saying "shit" as if he were caught is completely subjective and speculative.

The officers' testimony taken as a whole is unconvincing. They had no reasonable suspicion to stop Davis. The Government lists several factors for the Court to consider, but not all have merit. The Court is not convinced that Defendant looked nervous or walked *away* from the officers. The Court is not convinced that there is sufficient evidence to make the fact that it may have been a high crime area particularly relevant either. Nor is it particularly relevant that it was night since this was a very well lit area. The only factors that remain relevant are the bulge in his jacket and Davis' hand

9

movements. These factors alone do not provide an objective and particularized basis for stopping

Davis.  The officers acted on a hunch and nothing more.  Although their hunch proved correct, the

law does not condone the stop and search of an individual without a reasonable suspicion of criminal

activity. The Court finds that this not enough for reasonable suspicion.

**III.    CONCLUSION**

    Accordingly,

    **IT IS ORDERED** that the Motion to Suppress Evidence [Docket No. 18, filed December

14, 2011] is **GRANTED**.

    **IT IS SO ORDERED**.


                    S/Denise Page Hood
                    Denise Page Hood
                    United States District Judge

Dated:  January 7, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on
January 7, 2013, by electronic and/or ordinary mail.

                    S/LaShawn R. Saulsberry
                    Case Manager

10